UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| VERTRUE INCORPORATED, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) Docket No. 06-135-P-S |
| | ) |
| ROBERT GRAHAM et al., | ) |
| | ) |
| Defendants | ) |

RECOMMENDED DECISION ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

The defendants, Robert Graham and Michael Shane, move for summary judgment on both counts of the complaint.[1]  See Second Amended Complaint and Demand for Jury Trial ("Complaint") (Exh. G to Docket No. 1 in *Vertrue Inc. v. Graham*, Misc. Docket No. 05-87-P-S).  The current motion and its associated pleadings are revised documents, submitted in accordance with my oral order of May 23, 2007 (*see* Docket No. 79) directing counsel for the parties to revise and resubmit, at no cost to their respective clients, the motion for summary judgment and all associated pleadings from both sides of this case along with certification from local counsel that the revised pleadings conform to the requirements of this court's Local Rule 56, which the initial documents failed in many ways to do.  I now recommend that the court grant the motion.

---

[1] The complaint in this action was initially referred to the bankruptcy court, where the plaintiff was limited to claims for fraud and for violation of the Connecticut Unfair Trade Practices Act ("CUTPA").  *See Graham v. Vertrue Inc.*, 351 B.R. 1, 3 (D.Me. 2006).  The reference was thereafter withdrawn.  Docket No. 1.

1

# I. Summary Judgment Standards

## A. Federal Rule of Civil Procedure 56

Summary judgment is appropriate only if the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Santoni v. Potter*, 369 F.3d 594, 598 (1st Cir. 2004). "In this regard, 'material' means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant. By like token, 'genuine' means that 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.'" *Navarro v. Pfizer Corp.*, 261 F.3d 90, 93-94 (1st Cir. 2001) (quoting *McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Santoni*, 369 F.3d at 598. Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Triangle Trading Co. v. Robroy Indus., Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) (citation and internal punctuation omitted); Fed. R. Civ. P. 56(e). "As to any essential factual element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party." *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

## B. Local Rule 56

The evidence the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the Local Rules of this District. *See* Loc. R. 56. The moving party must first file a statement of material facts that it claims are not in dispute. *See* Loc. R. 56(b). Each fact must be set forth in a numbered paragraph and supported by a specific record citation. *See id*. The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]" Loc. R. 56(c). The nonmovant likewise must support each denial or qualification with an appropriate record citation. *See id*. The nonmoving party may also submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation. *See id*. The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement. *See* Loc. R. 56(d). Again, each denial or qualification must be supported by an appropriate record citation. *See id*.

Failure to comply with Local Rule 56 can result in serious consequences. "Facts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." Loc. R. 56(e). In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact." *Id*.; *see also, e.g., Cosme-Rosado v. Serrano-Rodriguez*, 360 F.3d 42, 45 (1st Cir. 2004) ("We have consistently upheld the enforcement of [Puerto Rico's similar local] rule, noting repeatedly that parties ignore it at

3

their peril and that failure to present a statement of disputed facts, embroidered with specific citations to the record, justifies the court's deeming the facts presented in the movant's statement of undisputed facts admitted.") (citations and internal punctuation omitted).

## II.  Factual Background

The following undisputed material facts are appropriately supported in the revised statements of material facts submitted by the parties.  The plaintiff is a Delaware corporation.  Statement of Additional Material Facts ("Plaintiff's SMF") (included in Vertrue Incorporated's Revised Opposing Statement of Material Facts ("Plaintiff's Responsive SMF") (Docket No. 88), beginning at 17) ¶ 1; Defendants' Revised Reply Statement of Material Facts, etc. ("Defendants' Responsive SMF") (Docket No. 95) ¶ 1.  In 2003 its headquarters were located in Stamford, Connecticut.  *Id*.  The plaintiff was formerly known as MemberWorks Incorporated.  *Id*. ¶ 2.  It markets and sells consumer discount membership programs in such areas as health care, shopping, travel, entertainment and personal security.  *Id*. ¶ 3.  Vital Basics, Inc. ("VBI") is a Maine corporation, Defendants' Revised Statement of Material Facts, etc. ("Defendants' SMF") (Docket No. 82) ¶ 1; Plaintiff's Responsive SMF ¶ 1, of which the defendants have been co-CEOs and 50% shareholders at all relevant times, Plaintiff's SMF ¶ 4; Defendants' Responsive SMF ¶ 4.  It was formerly known as Talk America Incorporation.  *Id.* ¶ 7.  VBI markets products through television infomercials, radio commercials, print advertising and direct retail sales.  Defendants' SMF ¶ 2; Plaintiff's Responsive SMF ¶ 2.  Defendant Graham lives in Florida.  Plaintiff's SMF ¶ 5; Defendants' Responsive SMF ¶ 5.  Defendant Shane lives in New York.  *Id*. ¶ 6.

On or about June 1, 2000, the plaintiff entered into a Memberlink Agreement (the "Agreement") with VBI under which VBI agreed to exclusively "upsell" certain of the plaintiff's membership programs to people who telephoned VBI in response to one if its advertisements for its

4

own products. *Id.* ¶ 10. In return, the plaintiff agreed to pay sales commissions to VBI. *Id.* ¶ 11. Under the original Agreement, VBI received sales commissions on a flat-fee basis. *Id.* ¶ 12. The Agreement was set to expire by its terms on December 31, 2003. Defendants' SMF ¶ 43; Plaintiffs' Responsive SMF ¶ 43. On or about June 25, 2001 the plaintiff and VBI executed Amendment No. 2 to the Agreement, which changed the way VBI's sales commissions were calculated and paid. Plaintiff's SMF ¶ 13; Defendants' Responsive SMF ¶ 13. Under this amendment, if a customer paid the entire annual membership without canceling the membership within the first year, VBI would earn a percentage of the annual membership fee at that time as a commission. *Id.* ¶ 14. Under this amendment the plaintiff paid an amount calculated to anticipate commissions that VBI might earn based on sales that month (the "advance"). *Id.* ¶ 15. The monthly calculation of advances was based on (i) estimated sales to be made in the upcoming month, which was based on the prior month's actual sales; (ii) multiplied by a projected retention rate (initially set at 40%), representing the percentage of initial sales the parties anticipated would pay the full annual fee prior to canceling; (iii) multiplied by the retail price of the program(s) in which such consumers enrolled; and (iv) multiplied by a commission rate on first-year sales (79%). *Id.* ¶ 16.

In a 30-day "true-up," in each month following an advance, the sales amount estimated in the prior month was reconciled to the actual sales. *Id.* ¶ 17. At 150 days and 360 days after an advance, the advance was adjusted to reconcile the actual retention experience with the projected retention rate. *Id.* ¶ 18. The projected retention rate used to calculate monthly advances could be adjusted if it deviated from the initial rate set by the Agreement, but only based on a three-month actual retention experience at a different rate. *Id.* ¶ 19. For approximately the first eighteen months after the new commission schedule took effect, the retention rate of customers to whom VBI "upsold" the plaintiff's products remained consistent with the 40% projected retention rate. *Id.* ¶ 20. In January 2003, as part

of its new marketing strategy, VBI began offering its customers a free trial period of Focus Factor, one of its products. *Id*. ¶¶ 8, 86. The average retention rate for January, February and March 2003 turned out to be 25.7%. *Id*. ¶ 22. In the spring of 2003 the plaintiff's finance department reviewed information about the decline in the retention rate. *Id*. 27. Tiffany Bennett, the plaintiff's vice-president of finance, informed William Olson, the plaintiff's executive vice- president of client services, that the retention rate had fallen from the "high 30s or 40s" into the "20s." *Id*. ¶¶ 24-25, 28.

Olson then contacted the defendants by telephone and told them that VBI's retention experience had deteriorated dramatically. *Id*. ¶ 29. Olson told the defendants that the plaintiff's prior monthly advances overpaid commissions to VBI as a result of the decline. *Id*. ¶ 30. He asked the defendants whether they knew why the retention rate had dropped. *Id*. ¶ 31. The defendants said that they did not know why the rate had declined. *Id*. ¶ 32. During one of several telephone conversations with the defendants about the drop in retention rates, Olson asked whether there had been any change in marketing. *Id*. ¶¶ 33-34. At some point during these conversations, Olson informed the defendants that the plaintiff would lower the advance calculation to recover more than one-half million dollars that had been paid to VBI under the existing projected retention rate. *Id*. ¶ 36. The defendants were very concerned and upset by the news that the plaintiff planned to reduce the May 2003 advance. *Id*. ¶¶ 36-37.

Olson reached an agreement with the defendants that was outside the terms of the Agreement to provide VBI with an accommodation under which the plaintiff would give VBI a monthly advance of $1,838,527 for April provided that VBI agreed that this payment represented an overpayment of $574,540 that would have to be deducted from the May payment. *Id*. ¶¶ 43-44.[2]

---

[2] The defendants have withdrawn, Defendants' Response to Plaintiff's Motion for Leave to Cure Inadvertent Filing Error, etc. (Docket No. 101) at 2 n.1, their request that all of paragraph 44 of the plaintiff's statement of material facts other than the statement that the new projected retention rate was 25.7% "be stricken as unsupported by the testimony and exhibit cited[,]" Defendants' Responsive (*continued on next page*)

On May 9, 2003 the defendants met with Olson, Bennett and Melissa Lunny at the plaintiff's Stamford headquarters. *Id*. ¶¶ 48-49. The primary topic at this meeting was the question why the actual retention rate was dropping. *Id*. ¶ 50. The defendants asked the plaintiff to be patient and to give them time to determine the cause. *Id*. ¶ 53. They asked the plaintiff to defer the one-time deduction of $574,540 in VBI's commission advance until July. *Id*. ¶ 54. The defendants said that they needed the money because, among other things, "they'd have a difficult time making payroll, their operating costs" and "meeting their obligations around marketing, operating costs, and cash flow." Defendants' SMF ¶ 47; Plaintiff's Responsive SMF ¶ 47. By the end of the meeting, the plaintiff had agreed to postpone until July 2003 the application of the $574,540 deduction in the advance that the plaintiff would pay to VBI. Plaintiff's SMF ¶ 56; Defendants' Responsive SMF ¶ 56. The plaintiff drafted a letter confirming this agreement and Bennett passed the letter across the table to Graham, who signed it. *Id*. ¶ 57.

The defendants and representatives of the plaintiff held a second meeting in Stamford on June 3, 2003. *Id*. ¶ 60. At this meeting, the defendants again stated that they did not know why the actual retention rate had dropped. *Id*. ¶ 61. During this meeting, the plaintiff agreed to adjust the way that the advances and "true-ups" would be calculated for the rest of 2003. *Id*. ¶ 62. To calculate the amount that the plaintiff would owe to VBI under the June 3 agreement, the plaintiff assumed that VBI would work to sell 40,000 new memberships per month. *Id.* ¶ 64. Vertrue agreed to pay VBI monthly advances of $274,803 for each of the next seven months based on this level of sales. *Id*. ¶ 65. The plaintiff advanced $274,803 to VBI in June 2003. *Id*. ¶ 66. Under its restructuring, the plaintiff paid

---

SMF ¶ 44. The plaintiff initially filed the wrong document as the Exhibit FF cited in paragraph 44 of its statement of material facts. Plaintiff's SMF ¶ 44. The plaintiff's unopposed motion for leave to replace this item with the correct document, Plaintiff's Motion for Leave to Cure Inadvertent Filing Error, etc. (Docket No. 99) is granted.

7

VBI advances of $176,380 in July 2003 and $15,592 in August 2003. *Id*. ¶ 75. This was the final payment made by the plaintiff. Defendants' SMF ¶ 42; Plaintiff's Responsive SMF ¶ 42.

On July 23, 2003 VBI wrote to Consumer Health Benefits, Inc. stating that the two companies had "preliminary conversations . . . regarding a consumer club pertaining to health related benefits and services. If a mutual agreement can be reached between the two companies, Vital Basics, Inc. intends to offer a CBSI[3] membership club to its customers." Plaintiff's SMF ¶ 78; Defendants' Responsive SMF ¶ 78. In August 2003 the plaintiff learned that VBI had breached the exclusivity clause in the Agreement be directing its Focus Factor customers to a competitor of the plaintiff's Vital Health Plan. *Id*. ¶ 79. On August 6, 2003 VBI entered into a contract with CBSI to sell CBSI's competing membership programs to its customers. *Id*. ¶ 80. On or about August 15, 2003 VBI started selling CBSI membership programs to its customers. *Id.* ¶ 82.

On or about August 16, 2003 VBI began reporting to the plaintiff sales that were "exceptionally low in volume." *Id*. ¶ 83. When asked about the reason for this, VBI responded that there was a "glitch in the sales transmission process." *Id*. ¶ 84.[4] Internal VBI memos and other documents as early as December 2002 and continuing through April 2003 included statements anticipating that VBI's change in marketing strategy would lead to lower retention rates. *Id*. ¶ 87. Olson would not have authorized any financial accommodation to VBI had the defendants told him about VBI's arrangement with a competitor in violation of the Agreement or their knowledge of the anticipated declining retention rate. *Id*. ¶ 91.

---

[3] The plaintiff's statement of material facts does not define "CBSI." While the letters do not correspond to the initial letters of Consumer Health Benefits, Inc., I assume from the context that the two entities are related.

[4] The defendants purport to deny this paragraph of the plaintiff's statement of material facts, but their denial actually admits most of the paragraph, merely stating in support of the denial that "[t]he exhibit cited references Ms. Chadbourne stating that there was a 'glitch in the sales transmission process.'" Defendants' Responsive SMF ¶ 84. I have accordingly used that language instead of the words "a computer glitch" that are present in the plaintiff's version of the paragraph.

In June 2003 VBI gave the defendants millions of dollars in distributions, later classified as loans. *Id*. ¶ 94. The defendants transferred these operating funds because they were "extraordinarily optimistic" about the financial prospects for VBI over the remainder of the year and believed it would be the best year financially that VBI had ever had. *Id*. ¶ 95. VBI originally recorded the transfers as distributions, but VBI's outside accountant and its vice-president of finance advised that the transfers had to be reclassified as loans. *Id*. ¶ 96. No documentation was created for these loans totaling $3.8 million and no repayment was intended unless and until future "distributions" were earned. *Id*. ¶ 103. The defendants had VBI book contingent future renewal commissions in a manner not compliant with generally accepted accounting principles. *Id*. ¶ 100.

In June 2003 the plaintiff informed the defendants that it estimated the remaining 150-day "true-ups" in 2003 would total $3.8 million to correct for over-advances in January through May 2003, based on an estimate that retention rates would track at 20%. *Id*. ¶ 101.

On December 2, 2004 a three-member panel of the American Arbitration Association held that VBI was in breach of the exclusivity clause of the Agreement as of August 6, 2003. *Id*. ¶ 81. The panel concluded that VBI was liable to the plaintiff for unearned over-advances totaling $2,203,972 plus prejudgment interest of $165,297. *Id*. ¶ 106. The panel also awarded the plaintiff $1,189,269 in damages for VBI's breach of the exclusivity covenants of the Agreement, representing the panel's approximation of profits that the plaintiff would have earned if VBI had performed its contractual obligations throughout 2003. *Id*. ¶¶ 107-08. The panel also awarded the plaintiff punitive damages of $1,340,000, which included attorney fees and costs. *Id*. ¶ 110. The panel's award stated that VBI "engaged in unfair and deceptive acts and practices under the Connecticut Unfair Trade Practices Act in that [VBI] (a) made fraudulent misrepresentations to induce [the plaintiff] to continue making monthly advances, (b) made fraudulent misrepresentations to induce [the plaintiff] to delay the

enforcement of its contractual rights, (c) misappropriated [the plaintiff's] marketing methods and customer retention strategies and used those methods in marketing a directly competitive product, (d) after receiving demand from [the plaintiff] for the return of over-advances in the amount of $3,800,000.00, [the plaintiff] depleted its cash assets in approximately the same amount, by making distributions to [the defendants]." *Id*. ¶ 109.

The plaintiff has received approximately $1,340,000 from VBI in accordance with VBI's bankruptcy plan of reorganization. Defendants' SMF ¶ 56; Plaintiff's Responsive SMF ¶ 56.

### III. Discussion

#### A. Fraud: Applicable Law

The defendants assume that Maine law applies to the plaintiff's fraud claim. Defendants' Revised Motion for Summary Judgment, etc. ("Motion") (Docket No. 81) at 4-7. The plaintiff contends that Connecticut law applies. Vertrue's Revised Memorandum in Opposition to Defendants' Motion for Summary Judgment ("Opposition") (Docket No. 87) at 13-15. There is a significant difference between the two states with respect to the elements of such a claim.

Pursuant to Maine law, a defendant is liable for fraud if it "(1) makes a false representation (2) of a material fact (3) with knowledge of its falsity or in reckless disregard of whether it is true or false (4) for the purpose of inducing another to act or to refrain from acting in reliance upon it, and (5) the plaintiff justifiably relies upon the representation as true and acts upon it to his damage." *St. Francis de Sales Fed. Credit Union v. Sun Ins. Co. of N.Y*, 818 A.2d 995, 1003 (Me. 2003) (citation and internal quotation marks omitted). Under Connecticut law, the elements of an action in fraud are "(1) that a false representation was made as a statement of fact; (2) that it was untrue and known to be untrue by the party making it; (3) that it was made to induce the other party to act on it; and (4) that the latter did so act on it to his injury." *Updike, Kelly & Spellacy, P.C. v. Beckett*, 850 A.2d 145, 166

(Conn. 2004) (citation omitted).  Maine law allows recovery if the defendant acted in reckless disregard of whether the statement at issue was true or false; Connecticut requires knowledge that it was untrue.  Maine law requires a showing that the plaintiff justifiably relied on the statement; Connecticut merely requires actual reliance.  Maine law requires all elements of the claim to be proved by clear, convincing and unequivocal evidence.  *Eaton v. Sontag*, 387 A.2d 33, 36 (Me. 1978).  Connecticut subjects only the first three of the four elements of the cause of action to a standard of proof higher than the usual preponderance of the evidence.  *Duplissie v. Devino*, 902 A.2d 30, 38 (Conn.App. 2006).

The parties appear to agree that this court's jurisdiction in this case is based on the diversity of citizenship of the parties. Opposition at 13; Defendants' Revised Reply Memorandum, etc. ("Reply") (Docket No. 94) at 9-12.  In such cases, when a claim based on state law is asserted, the court must determine which state's law to apply.  It does so by applying the choice-of-law principles of the forum state, which in this case is Maine.  *Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 73 (1st Cir. 2006).  Maine has adopted the "most significant contacts and relationships" approach to the choice- of-law analysis. *Flaherty v. Allstate Ins. Co.*, 2003 ME 72, ¶ 16, 822 A.2d 1159, 1165.

> The contacts to be considered are as follows:
>   (a) the place where the injury occurred;
>   (b) the place where the conduct causing the injury occurred;
>   (c) the domicile, residence, nationality, place of the parties, and
>   (d) the place where the relationship, if any, between the parties is centered.

*Id*. & at 1166.  Here, the injury alleged could be characterized as having occurred in Connecticut, where the plaintiff made the advances that appear to constitute the damages it claims, Complaint ¶¶ 33-34, 36, but it could also be characterized as having occurred, at least in part, in Maine, where VBI received the payments from the plaintiff that are in issue, *id*.  The place where the conduct causing the alleged injury occurred could be Connecticut, New York and/or Florida, where the defendants are

11

alleged to have made the misrepresentations involved, *id.* ¶¶ 28-30, 32-34, 42, or Maine, where VBI was located at the relevant time and where it is alleged to have acted in a manner that led to the plaintiff's damages, *id.* ¶¶ 19-21, 37.  The "place" of the plaintiff is either Delaware or Connecticut; the domiciles of the defendants are Florida and New York.  The place where the relationship of the parties was centered was most likely Maine, where VBI performed its duties and received the plaintiff's payments under the Agreement.

The plaintiff contends that these facts establish that Connecticut has the more significant relationship to the alleged fraud and to the parties: "Connecticut is the state in which the injury occurred: i.e., where Vertrue lost approximately $1.1 million as a result of the defendants' fraud.  Connecticut is also where Graham and Shane are alleged to have made the most material of their misrepresentations in this case — during meetings at Vertrue's Stamford headquarters on May 9, 2003 and June 3, 2003 — . . . .  Connecticut also is where Vertrue is domiciled."  Opposition at 14-15.[5]  The defendants' response asserts that Connecticut's law, which they say allows a plaintiff to act "entirely unreasonably and still recover for fraud," is "directly contrary to both Maine and New York law" on this point, "plainly punitive," "contrary to the needs of the interstate and international systems," "contrary to the protection of justified expectations," "contrary to the basic policies underlying the particular field of law," "contrary to certainty, predictability and uniformity of result," and "contrary to ease in the determination and application of the law to be applied."  Reply at 10-11 (internal punctuation omitted).  The latter five items are among those listed in Section 6 of the Restatement (Second) Conflict of Laws to which the Maine Law Court referred in *Flaherty*. 2003 ME

---

[5] The plaintiff also asserts that "the parties had justified expectations that Connecticut law would govern their relationship, since the Agreement stated that it would be 'governed by and construed under the laws of the State of Connecticut.'" Opposition at 15.  Aside from the fact that the defendants were not parties to the Agreement and have not otherwise been shown to have agreed to be governed by any particular state's law in any particular situation or relationship, this factual assertion is not included in the plaintiff's statement of material facts.  Merely attaching the Agreement to the complaint, Complaint ¶ 7, or authenticating it, Revised Affidavit of John
(*continued on next page*)

12

72 ¶16 n.4, 822 A.2d at 1166 n.4. First, there is no "international system" involved in this case. Next, the defendants have made no showing that the elements of a claim for fraud recognized by Maine, New York and Florida constitute a "basic policy underlying" this field of law. The argument that parties domiciled in a particular state are "justified in expecting" parties domiciled in other states with whom they interact to act in accordance with the law of their state when it differs from the law of the state of the domicile of the other party is, as a practical matter, virtually circular. It is common knowledge that different states have laws that differ on some points; no one can be justified in expecting someone from a different state to defer in such circumstances to the law of the first person's state. How does one ever decide who is the party entitled to deference in such a relationship?

It appears to me, on balance, that Connecticut has the most significant relationship to the subject matter of this action and that its law should apply to the fraud claim.

### B. Fraud — Substantive Analysis

As evidence of the first two elements of the Connecticut test, the plaintiff asserts that "false representations, known to be untrue, were made as statements of fact." Opposition at 16. It identifies those representations as the following:

> The defendants represented that they had no idea why retention rates plummeted in 2003, while their own internal records created at that time reveal that they were aware for months that lower retention rates resulted from VBI's aggressive new "Free Focus Factor" marketing program. The defendants also told Mr. Olson that VBI would have financial difficulties if Vertrue did not advance an additional $542,540 in May 2003, then materially delay the true-up procedures — changing what the Agreement otherwise provided for — and a reasonable jury could conclude that the defendants knew VBI would have no financial difficulty operating with the lower Advance amount and reduced cash flows because the defendants took millions of dollars of "disbursements/loans" out of the company's excess cash.

---

McVeigh (Attachment 1 to Docket No. 88)) ¶ 13 & Exh. L thereto, does not suffice in the context of summary judgment. I give no weight to this factual assertion.

13

*Id*.  The paragraphs of its statement of material facts cited by the plaintiff in support of the first of the two alleged misrepresentations establish only that the defendants were aware of internal VBI documents "as early as December 2002 and continuing through April 2003" that included statements anticipating that VBI's change in marketing strategy would lead to lower retention rates.  Plaintiff's SMF ¶¶ 87-88.  This does not establish that the defendants made the alleged misrepresentation.  For that, the plaintiff asserts that "the defendants are unable to contest that they made the representations" because they "claim they are able to remember virtually nothing about what they said during" the conversations and meetings at which the plaintiff alleges they made the misrepresentations.  Opposition at 16.  I assume, since the plaintiff has not cited to the summary judgment record with respect to the alleged misrepresentation itself, that it means to refer to paragraphs 31-32, 34-35, 53 and 61 in this regard.  *Id*. at 4-7.  Those paragraphs may fairly be read to assert that the defendants professed ignorance about the cause of the decline.

The defendants argue in response that the plaintiff "now seeks to redefine the purported misrepresentation" from that alleged in their pleadings and discovery responses as a representation that the defendants were surprised by the fact that there was a drop in retention rates to a statement that they were ignorant of the cause of the drop in retention rates.  Reply at 6-7.  They contend that "the Court should not allow a change in position at this stage." *Id*. at 7.  However, the complaint, while it does allege that the defendants professed surprise at the lower retention rates, Complaint ¶ 30, also alleges that "defendants were aware of the negative impact VBI's marketing change had had on the retention of Program enrollees and, in fact, had internal memos anticipating a lower Projected Retention Rate," *id*.¶ 31.  These two paragraphs, taken together, sufficiently allege the plaintiff's current theory.  Similarly, the only discovery response cited by the defendants, Reply at 6, sufficiently encompasses the "current" description of the first alleged misrepresentation, *see* Vertrue

14

Incorporated's Supplemental Responses to Defendants' Interrogatories Nos. 7, 9, 10, 12 and 14 (Exh. 1 to Revised Reply Affidavit of Jeffrey M. Rosin, etc. (Docket No. 96), at 2-7.

With respect to the second alleged misrepresentation, the plaintiff cites only one paragraph of its statement of material facts, Opposition at 16, as to which the defendants contend that the cited portion of the summary judgment record does not support the paragraph, and they admit only that VBI gave them distributions in the summer of 2003, Defendants' Responsive SMF ¶ 94. The plaintiff's citation in support of paragraph 94 is "McGrath Deposition Transcript, Exhibit AA 116:19-117:19." Plaintiff's SMF ¶ 94. That testimony establishes only that distributions were made to the defendants; it says nothing about the alleged misrepresentations. Deposition of Steven G. McGrath (Exh. AA to Revised Affidavit of John McVeigh Authenticating Documents (Attachment 1 to Plaintiff's Responsive SMF)) at 116-17. This omission, unlike that associated with the first alleged misrepresentation, has been identified by the defendants, and the plaintiff's earlier factual presentation in its memorandum of law also cites only the insufficient paragraph 94 of the plaintiff's statement of material facts. Opposition at 10. Accordingly, I will not consider the second alleged misrepresentation further.

The plaintiff next asserts that it has satisfied the third element of the Connecticut test for fraud, contending that the alleged misrepresentation still at issue "was designed to induce Vertrue to give VBI more money." Opposition at 16. Because the defendants, the only shareholders of VBI, "stood to benefit personally by inducing Vertrue to overadvance more money to VBI," the plaintiff asserts, without citation to authority, "a jury could conclude that they intended to induce Vertrue to do so." *Id.* at 17. The defendants do not respond directly to this argument, choosing instead to contend that the plaintiff's argument "impermissibly seeks to use the distributions VBI made to the defendants as the basis of its claim," because "[t]his Court and the Bankruptcy Court have made clear that the plaintiff is prohibited from asserting any impropriety with regard to the distributions." Reply at 7-8. Since I am

15

not considering the second alleged misrepresentation, the only one which the plaintiff seeks to support with references to the distributions, I do not consider this argument, although I disagree with its characterization of the use which the defendants seek to make of the fact that the distributions occurred.

Of course, a court cannot base its summary judgment decision on the fact that a party has not responded to a particular argument. *Vélez v. Awning Windows, Inc.*, 375 F.3d 35, 42 (1st Cir. 2004). The problem with the plaintiff's third-element position with respect to the first alleged misrepresentation is that there is nothing inherent in the profession of surprise at the decline in retention rates or of ignorance as to the cause of that phenomenon that compels the conclusion that, if false, such a statement was made to induce the plaintiff to act on it by giving VBI more money. Indeed, as the defendants point out, Motion at 15-16, such a statement is more likely to evoke from a reasonable person in the plaintiff's position the response that it will not give VBI any more money at all, at least not until a reasonable explanation is given, rather than to give VBI even more money than it would otherwise be entitled to under the parties' existing contract.

This makes it unnecessary to consider the plaintiff's argument with respect to the fourth and final element of a fraud claim under Connecticut law. The motion for summary judgment should be granted as to Count I.

### C. The CUTPA Claim

The plaintiff asserts that "[t]he defendants do not argue anywhere in their Motion that they are entitled to summary judgment on Vertrue's claims under CUTPA." Opposition at 20. That is not entirely accurate. The defendants did contend that "[t]here does not appear to be a dispute that if Vertrue's fraud claim fails, its CUTPA claim fails as well. . . . Thus, the focus is on the failure of the plaintiff's fraud claim, which necessar[il]y results in the failure of Vertrue's CUTPA claim as well." Motion at 4 n.5. I do not see any such agreement in the plaintiff's submissions; in fact, the plaintiff

16

asserts that "there are numerous circumstances where one can prove a violation of CUTPA on facts that are insufficient to prove fraud." Opposition at 20. The defendants quote a statement of the bankruptcy judge which they characterize as "recogniz[ing]" that their view of the interrelationship of the two claims is correct, Motion at 4 n.5, but I cannot read the quoted language so broadly. In the absence of any other reason why the CUTPA claim should fail when the fraud claim fails, regardless of the reason for the failure of the fraud claim, I will consider the CUTPA claim on its merits.

The only argument made by the defendants that I have not yet addressed, which does appear to apply to both the fraud and the CUTPA claims, is the contention that the plaintiff has sustained no damages. Motion at 7-8, Reply at [1]-5. Their argument appears to be that, because the plaintiff initially pursued a claim for $3.8 million against VBI in arbitration and the parties stipulated that by the time the contact terminated the overadvance had been "reduced" to $2.2 million, an amount that is included in the arbitration award and is being paid in accordance with VBI's bankruptcy plan, the plaintiff has already "recovered" $1.6 million, an amount in excess of the $1,041,315 which it seeks to recover in this action. Motion at 7-8. They assert that the plaintiff accordingly has not been injured and thus may not recover against them, citing *Hyde v. Shine*, 199 U.S. 62 (1905).[6] *Id*. at 8.

This argument ignores the very real difference between the concepts of injury and damages. In *Hyde*, the Supreme Court expressly rejected the argument that a plaintiff who received the same consideration that it would have received in the absence of the alleged fraud may not bring an action for the fraud. 199 U.S. at 81. Indeed, as the plaintiff points out, Opposition at 22, under Connecticut law, a plaintiff may seek damages that are duplicative of all or part of the damages awarded to a third party in a separate proceeding under a theory of joint and several liability, *Haynes v. Yale-New Haven Hosp*., 699 A.2d 964, 967 n.6 (Conn. 1997). I cannot determine from the summary judgment record

---

[6] Counsel for the defendants is reminded that a citation following a word-for-word quotation from a specific case, enclosed in
(*continued on next page*)

17

whether the plaintiff has received all of the money due it under the bankruptcy plan; the plaintiff certainly asserts that it has not, *see, e.g.*, Plaintiff's Responsive SMF ¶ 57, Plaintiff's SMF ¶¶ 115-16. The law only requires that the plaintiff not actually recover its damages more than once. On the showing made, the defendants are not entitled to summary judgment on a theory that the plaintiff has already received — as opposed to should at some future point receive — payment of all of its claimed damages.

Beyond this issue, the plaintiff provides very little discussion of the elements of its CUTPA claim, relying instead on broad generalities, *i.e.*, "CUTPA 'proscribes a broader range of conduct than did the common-law action for innocent misrepresentation,'" Opposition at 20; "a finding of fraud is sufficient to establish a violation of CUTPA," *id*.; and "each of Graham and Shane's fraudulent misrepresentations to Vertrue constituted an unfair trade practice under Connecticut law[,]" *id*. at 13. I have already recommended summary judgment on the plaintiff's fraud claim, thereby disposing of at least the second of these three arguments and possibly the third. The first argument is so general as to be meaningless in the context of the plaintiff's specific statutory claim. The statute may well proscribe a broader range of conduct than did the common-law action for innocent misrepresentation, which is not involved in this case in any event, but in order to survive a motion for summary judgment, the plaintiff must at a minimum identify the conduct of these defendants which it contends violates CUTPA and why it contends this is so. The "why" is completely missing from both the first and the third conclusory arguments presented by the plaintiff.

Accordingly, the defendants are entitled to summary judgment on the CUTPA claim.

---

quotation marks, must include a specific page reference, not merely a citation to the first page of a case, however old that case may be.

18

### IV. Conclusion

For the foregoing reasons, I recommend that the defendants' motion for summary judgment be **GRANTED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof.  A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*
*Unless the district judge directs otherwise, the objecting party must promptly arrange for transcribing the record, or portions of it, in accordance with Fed. R. Crim. P. 59(b)(2).*

Dated this 17th day of July, 2007.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge